All right, we've run out of 10-minute preside cases. We're now up to 20-minute preside cases. So we're going to hold you strictly to the time limits in these three cases. So if you want time for rebuttal, you'll have to save it out of your opening time. Thank you, Your Honor. I would like to save about five minutes for rebuttal, if that's okay. I will try to tell you, but it's your responsibility. It's the burdens on counsel to stop, and I'll try to remind you. Thank you, Your Honor. My name is Chris Troupas, and I am counsel for the plaintiff, Appellant Richard Peterson. With me at counsel table is Ken Nyman, who was co-counsel during this case. I want to advise the Court that after the briefing on this case, there was another decision on bank by this Court in Rene v. MGM Grand Hotel. I cited the first version of Rene v. MGM Grand Hotel in one of our briefs. However, I don't believe that the rehearing of that case, the decision that this Court entered, affects the argument that we'll be making here or should affect a decision in this case. In that opinion written by Judge Fletcher, he indicated that we would hold that an employee's sexual orientation is irrelevant for purposes of Title VII. It neither provides nor precludes a cause of action for sexual harassment. It goes on to say that it is enough that the harasser have engaged in severe or pervasive, unwelcome physical conduct of a sexual nature. I think that opinion, fortunately or unfortunately, is a plurality, though. It's not a majority. I believe that's correct, Your Honor. But I still don't believe that with respect to the conduct that's at issue in this case, that Rene should alter the decision. It certainly would not alter my argument with respect to the ability of Hewlett-Packard to accommodate Richard Peterson's conduct. Basically, Your Honors, the Richard Peterson, my client, was employed by Hewlett-Packard for 21 years. During all of that time, he had deeply held religious convictions. But during 20 of those years, he held them to himself. Okay. Let's get to the what you think they should have done. You say they didn't accommodate his convictions. That's correct, Your Honor. What is it that you would have wanted them to do to accommodate him? They could have done a number of things, Your Honor. First thing, I don't think that there was any need to, say, take the poster down at all. As a practical matter, as the record shows, there wasn't a single person who complained about the poster being up. There wasn't a single person who claimed to be offended. So, in effect, he put up a poster. But does that matter? I mean, you put up a poster that says, niggers go home. But that wasn't. Does that mean you can't tell a person to take it down until somebody complains? I think the example that you gave, niggers go home, I think is not an innocuous philosophical statement. It is instead, it would instead be a statement directed at certain people within or at the workplace. And I think that they could say, take that statement down. I think that's far different than saying that putting up a biblical statement, a Bible verse that basically says that this type of conduct, God disapproves of this conduct. As opposed to say, making a statement, niggers go home. Well, God didn't make the races the same color because he intended them to be separate. I happen to have worked for a judge for one summer who wrote an opinion that said that said if God meant blacks and whites to live together, he wouldn't have made bluebirds and redbirds sit on the same branch. That's it's you think that offensive that statement is not offensive that the people, the evil doers who in that third. I have a little. I think that the state. I think that the statement can be interpreted in a number of ways. But I think that the statement in and of itself is a philosophical statement, not directed at a person. And I don't think the title seven calls. And even if it were considered an offensive utterance, would say that that created such a pervasive and discriminatory work environment that that Mr. Peterson was violating either HP policy. Your first point is that he could they could have let him keep it up. That would have been what you said. You had several accommodations that the second accommodation they could have taken down their post. They could have taken down their post. The third accommodation. This is a plant with five thousand workers that spans acres and acres. Oh, can I back you up for a minute before you go into the third on the second one that they could have taken down their posters that basically you're abandon their program to promote diversity or toleration. Right. I don't think that that would require them to abandon a program. I think that that they would have been acknowledging that the statement that they put up, the poster that they put up was as offensive to Richard Peterson and his religious convictions as they claim the statement he put up was offensive to their. So you say could they have could they have some other form of a program to promote tolerance of different people? Certainly. And they promote specifically tolerance of people who are gay by some other means than the poster they put up. They certainly could have. And in fact, Richard Peterson commented repeatedly and it's in the record that he said, I have no problem working side by side with homosexuals. That's not the issue. He said, I've worked with them for 20 years. The issue was that these are people who have a hundred different characteristics. They could be they could be called. They could put up a poster and say, this is a good worker. This is a family man. This is a person with good values. This is a this is a team member. And he said, I could live with that. But when they label the person gay and say, now you're to accept him because he's gay. At that point, it offended his religious convictions. And they did the same with Richard Peterson. Now, wait a minute. That's his construction of that statute of that poster. That's correct. I think it said you to accept him despite the fact that he's gay. That's what that's what HP claimed. And that seems to me a reasonable construction of that poster. Well, the issue is what's what whether or not the rule is to be applied on a subjective or objective basis. And under Title VII, in order for either side to claim there was a hostile work environment, there needs to be an objective determination of that issue. An objective determination is that it would be quite implausible to read that as you are to accept that person because he is gay. And I agree with that. And I agree with that. The point is that Richard Peterson, for whatever reason, because of his religious convictions, couldn't accept that. I'm not saying that it is that that it is subjectively or objectively reasonable to another person to say he should have accepted it. In fact, in the four meetings between him and HP, it was principally all four of those meetings consisted of change your mind. We really didn't mean that. We really didn't mean that. But I don't understand is what the poster. Why you say they could have they could have attempted to accomplish all the purposes that the poster program is designed to accomplish, to to preach diversity and acceptance of diversity, that they could do that as long as they didn't use a poster? No, I'm just saying that I didn't say that. What I meant was that even without the posters, Judge Gould commented that that if they take the posters down, are you saying that HP should abandon its diversity campaign or diversity program? And I'm saying, no, that HP is entitled to pursue whatever campaign that it does. But it needs to do it on a fair basis and equitably accepted in the workforce. If if promoting acceptance of gays in the workforce, I don't think to me it doesn't matter what the purpose of the poster was. It which of the two meanings it seems to me was designed to say to employees, we're a company that has this policy. We hire people of all types and we expect them to be treated decently and expect our employees to accept. And Mr. Peterson did treat them decently and did accept that. But that's all the poster says. That wasn't his perception that what did he perceive? He perceived that that poster was HP statement of this is who we are. We promote the acceptance of this, of the gay lifestyle. That's how he perceived we promote the acceptance of gays in the company. And and I understand that. Yeah. But I'm merely saying that Mr. Peterson didn't understand that there was a I thought there were a series of posters and one is gay, one's Hispanic, one's African-American. So, I mean, could he have really thought when they have a poster that says Hispanic, that they're trying to promote that he's going to become Hispanic? He did or or become an American? I can't say what he thought about those. Seems a little bit difficult. Let me ask a question. How far this religious conviction principle then extends under under repellent theory. Let's say he had said that I have religious convictions that that a woman's place is only in the home or should be primarily in the home. And I look in the Bible and it talks about patriarchs. And, you know, I don't think we should have women executives here. Let's just assume that any he wanted to post a bunch of posters. I'm sure you could find something in the Bible that would support that idea. Could find something, you know, sports, a lot of ideas if you look hard enough. So let's say he'd done that. Could he have done that? Or could or could a person. In addition to that, it could a person who says my religion teaches me that it's the only proper religion that everyone who's my religion is going to heaven. Everyone who's any other religion, no matter how good is going to the other place. I think that they post posters that say that. I think I don't think that we necessarily get that far, because in this case, all that Mr. Peterson did was post an exact quotation of particular scriptures. He didn't. It's his explanation for which he was fired in the confidential meetings. He explained what he meant and they fired him for what he meant, not what they said fired when he persisted in putting it up after having been warned. Don't put it up because if you do put it up, you're going to get camp. That's right. It's religious. He was unable to to alter his religious convictions in that regard. And he was fired for that. HP wasn't asking him to alter his convictions, except as was necessarily implied by don't put up that. But his little tag, that is to say, if he said, listen, I'm not changing my mind, but I won't post that. H.P. would have kept him on the watch. To some people, to some people. Part of your part of your mind, part of your mindset is the requirement that you say something in this direction included the obligation, in his view, to put up and the court lower court, I started with the accommodation. I'm assuming for the moment that he did have a religious conviction and that his conviction included under these circumstances, he has to put up a poster. And the question that I was asking about is, do they have to accommodate that conviction if it offends their policies and other employees? And as I understood you, you said the accommodations they could have made were that they could have taken down their posters. But what I didn't understand is why promulgating their policy through the use of everything but posters. Why wouldn't why that would not be just as offensive to him if they distributed newspapers? They have ads. They have speeches. Well, the premise. Why is it the posters? Because the first place HP contended throughout this case that it wasn't their policy to promote the gay lifestyle. No, no, I'm not talking about promoting the gay lifestyle. I'm talking about diversity of the workforce and acceptance of diversity by the employees. And Mr. Mr. Peterson's concept of what diversity means was different than what HP's concept of what diversity means. And if they had pursued their policy in such a way that it wouldn't have led to misunderstandings among a large number of the workforce or a number of members of the workforce as to what their policy was, they wouldn't have had any problem with Mr. Peterson. Cynthia Stanfill mentioned that that she was aware of the fact that the campaign had engendered misunderstandings. The poster campaign had engendered misunderstandings among a number of people in the workplace. And he wasn't the only one. She said that at page 72 in the excerpts of the record. He said, because it's it's not our intent to have somebody get so upset that they feel they have to leave the company. And I've had these conversations with people before. And I think there's a lot of misunderstanding around what HP is trying to do on this particular issue. Cynthia Stanfill, the diversity director, said, we know there's misunderstanding. Well, as you said, people may leave the company in misunderstanding because they think the company is going to be a company that hired gays and they don't want to work there. It's not. But Mr. Peterson never said that the purpose of the posters was to try to make him become gay. No, Mr. Peterson felt that the purpose of the poster was to align the workers at HP with a gay agenda, with being accepting the homosexual lifestyle. And he felt that he needed to say, you're saying who you are. I need to be able to say who I am. And to go back to your point about what whether or not this is consistent with policy and also Judge Gould's point at page 140 of the excerpts of record, HP says that it will consider requests for accommodation for individual employees' personal expression of religious practice. So it isn't as though HP said, we're not going to make some provision for you if you have a sincere belief that needs accommodation and if we can do so. To return to Judge Gould's comment about whether or not how far Mr. Peterson could go, I don't think that I have problems myself with with saying that employees can run rampant in the workplace and can prevent an employer from instituting the policies that it wants. I don't believe that they have that authority, but I don't believe this is that case. But we can't say there's only one thing I don't think we can do. Maybe I'm wrong, but I don't think we can say there's one policy to express scripture from the Old Testament that will be permitted. But if some other worker is of a different religion or maybe one that we don't know as much about and they want to put up a poster with something from their holy scripture, they can't do it. And in that regard, I'd say two things, Your Honor. First, that Title VII talks about discriminatory, insulting remarks or comments or whatever directed at someone, directed at that person as opposed to conduct, and that specifically have an effect on it that are offensive to that person. To that extent, if scripture or any other words were used to attack someone for them personally, to attack a gay man, the person on the poster, for instance, if Richard Peterson had gone in front of him, opened up the Bible and read it to him and said, look, this is you and you are going, like in the Chalmers case, then I would have no problem in saying he doesn't have that right. It's using scripture or any other words. But on the other hand, if a person is making a philosophical statement, this is what I believe, in response to what he perceives, HP said, this is what we believe, then he has not transgressed Title VII and he has not made an offensive statement. And in that regard, my remaining point on this issue is that HP created an environment where the employer expected comments, invoked those comments and expected them. If HP had said we don't want any comments, they have a right to do that. But once they said we're going to put this campaign out because we know it'll start people talking and they did that and they expected it, then when they can't say but Christians don't talk and we've been keeping you busy. But I have noticed you're in that last. Thank you. And I would like to reserve the remainder of my time. We'll give you the five minutes. Let me just ask you one quick. The two accommodations that you suggest could have been made are that either they could have taken down their posters or he could have been allowed to keep up his. And I had a couple of other thoughts on that issue, too. I said HP is a huge place. It has 5000 workers and his job is a telephone job. He works on the telephone making calls for tech support. He could have been put in a cubicle in a corner that nobody would have seen him. Or HP could have created a diversity forum, a spot where people that want to put something up, whatever they want to post, so long as it doesn't offend people, are entitled to put up their own posters. But they could have made a rule that that's the only place. And then if a person was going to be offended, they simply don't have to walk down that into that corner or that spot. None of those ideas were ever pursued. The only thing HP ever offered as an accommodation was set up a network group that if you check at page one thirty six of the of the excerpts of record, you'll note is specifically prohibited for for religious organizations. Her last day is sort of like a time, place or manner restriction. They can say you can do your poster, but only in this one hall or in this area. We'll have a free speech area. It has worked in other contexts. And so I wouldn't feel loath to go there. I think of around, you know, you know, that case, which one? Pornographic theaters. Oh, yes. Oh, yes. I do. Yes, Your Honor. That's a facetious remark. I don't want to compare that to the scriptures here. Facetious remark. Thank you, Your Honor. Please, the court. I'm William Mock. I represent the appellee, Hewlett Packard, in this case. I think the court's questions indicate that they appreciate the core issue of this case. I'm going to state it for you is what I believe it is. Must an employer accommodate an employee who is protesting the employer's legitimate activities, violating its harassment policies and being insubordinate because the means of protest selected by that employee is either scripture or is motivated by a religious belief. Hewlett Packard did accommodate Richard Peterson. Richard Peterson disapproved of their very legitimate activity of promoting diversity, a long standing business principle with this company and its 86000 employees in over 28 cities and 120 countries. They allowed him without any comment or reprisal to print a letter to the editor in the Boise newspaper condemning this program. Every day he drove into the parking lot at HP with bumper stickers expressing his views on homosexuality. Does the record show when he began driving into the parking lot with that or those bumper stickers? It does not in terms of a particular time, I would say, Judge Fletcher. It was certainly within a few years. I'm wondering whether those bumper stickers, whether the record shows whether those bumper stickers preceded the posters going up. That is to say, were they in response or not? Oh, no, they preceded that. They preceded it. And let's be clear here, I think, first of all, Richard Peterson was protesting a particular poster, but he also, as he met with four managers, actually five managers on four different occasions, made it clear that he had deeper concerns than simply the particular poster. Now, the poster, I want to take what Mr. Troopis has suggested here to its logical extension with any employer, particularly this employer, which is that the subjective view of the employee as to a poster with the word gay on it, just that, then becomes a legitimate enterprise for that employer to express religious views and to force the employer to capitulate by taking down that poster because of his subjective interpretation of that single word. And that's all that poster was. Mr. Peterson, upon examination in his deposition, explained that to him, gay meant a gay lifestyle. Gay lifestyle meant sodomy. Sodomy was a sin. Therefore, they were promoting sinful conduct by the word gay. But the subjective view can't be the driving force for an obligation of accommodation. Previous to this, Mr. Peterson had problems with the fact that employees were dressing up in Halloween costumes because Halloween was a celebration of the devil. In conflict with his religious beliefs. Is the accommodation then for that, that the company must stop Halloween costumes? Is that an issue in front of us or is that just an attempt to say that he's a bit extreme? No, it's not an attempt to say he's a bit extreme. I could use another example, frankly, that that that is another hypothetical. Valentine's Day. I perceive it as a religious statement supportive of the religion of Catholic religion. I'm not Catholic. I'm opposed to it. I want to put up my scriptures with respect to that particular activity and I want the employer to accommodate that. The fact that he spoke out on Halloween. I'm not here to trash Mr. Peterson or his beliefs. I want to respect his beliefs and I think the company vigorously attempted to respect his beliefs. When you ask the company to take some effort to meet with an employee and try and resolve these differences, they did this repeatedly. How how broad was Mr. Peterson's request as part of the accommodation to take down the poster with respect to the gay? Was it take down the post, the gay poster throughout the company, throughout this building, the poster that was nearest to his workstation? Do we know this? All I can say is the discussion did not get as particular as to the broad scope. But the word was posters. He said, for example, didn't get that particular. I beg your pardon. Didn't get that particular. That is to say, if he had only asked, listen, I don't want the one nearest my workstation. Otherwise, keep them up. That's a different question from I want them all down. I let me let me step back from the question a moment because it assumes, I think, a representation which is being made by counsel for the appellate here, which is not supported by the record. I didn't say that one close by. I said the one nearest. I understand that dispute. There's no facts that the one near him was this gay poster. There's no facts to support that. I understand perfectly what you're saying. And I deliberately chose my word to say the one nearest. I can I going to be one that was nearest, whether it was quite some distance away or right next. Mr. When he met with Cindy Stamphill, she said, I wish there were something I could do. He said, I don't know what it is you could do except take down those posters and quit publicizing them in the weekly paper on the website. Now he's referring to a gay and lesbian group. When he met with Mr. Fowler, Mr. Fowler says, is there any way you can channel your convictions productively as opposed to a message of condemnation? He said, I don't see any way I can compromise what I'm doing that would satisfy HP and my own conscience. Basically, while they explored and I think in good faith attempted to find a solution here and I indicate again, he had been able. I think we need to put this in the context of Tiana. Let me just say it for a moment and hopefully it will make some point. Tiana says that the question here is whether or not he must prove first whether he has a bona fide belief, the practice of which conflicts with employment duty. Now, we seem to skip over the practice of which. What was the practice that created a conflict that required accommodation? If it was to speak out against evil, to criticize the program, he had done that. What is the specific commandment that required him to do what he was doing in the workplace? He could not testify to anything that would support that. If he interprets his obligation under whatever scriptures he believes in, that that obligation to speak out is measured by what is being said that has to be counted. If that's his religious view, I'm not sure it's appropriate for us to say that he's misinterpreting the scripture. The scripture doesn't require him to counter the specific poster with another poster. And I agree with that. I don't think it's the province of the court to question him. But I do think it's and question the sincerity of. But I do think it's the province of the court and the province of this process to ask, what is the particular practice that we're dealing with here? And when he says it's to speak out against evil. Well, must it be in every context? No, it's not in every context. Must it be in the workplace? No, it does not have to be in the workplace. Must it only be on homosexuality or is it on all sinful conduct? It depends under the circumstances. So now we have a practice which is in and of itself, not necessarily in conflict. He is not. He's not gotten a message to God from God to do this. The following way of looking at it occurs to me that for 20 some years or 20 years, there's basically no difficulty over this. He works side by side as far as the record shows in complete harmony. The only time we get this dispute is when, in a sense, Hewlett Packard starts it. That is to say, they put up the poster in the workplace. And in response to that poster, he puts up a poster of his own. That is to say, he does not seem to have a free floating claim that because there are gays in the workplace, I want to post scripture at my workstation. The only time he does it is when within the workplace as a whole, these posters go up. Why is it not a reasonable thing for him to do under that circumstance? Why wasn't it reasonable him to post scripture? Not a reasonable thing for him to do when Hewlett Packard has posted these. Diversity is our strength posters, including one with a picture of a of a gay person, a gay man. Why is it not reasonable for him then to respond precisely to that? It's pretty narrowly tailored response to two things, Judge Fletcher. First of all, it was not the first time he had also distributed religious literature in response to Halloween. That had occurred in 1996, two years previously. A supervisor had met with him and talked to him about it. So it was not the first time he had expressed himself in some fashion to a particular practice that was taking place in the workplace. The second thing is that what HP was doing and the scriptures, the scriptures, as HP perceived it, violated its policy on harassment. And upon inquiry, Mr. Peterson confirmed their suspicions. They were intended to be judgmental. They were intended to be hurtful. They were intended to condemn practices. They were intended to save souls. And if he say these are intended to be hurtful, what do you say? How do you make? How do you conclude that they were intended to be hurtful? Because he was asked. He tape recorded every meeting he had with the manager. We got the tapes. And when they were transcribed, he was asked. I can't remember the exact words. I know it's in the brief. But he was the statement was made by one of the interviewers that that they were hurtful and he admitted they were hurtful. They were judgmental. He admitted they were in judgmental. He even went on to say that in order to bring people to Christ, you would have to. It would be hurtful. The process would be hurtful. He recognized that there was a hurt or an offense to other people by his conduct. And so the question here about H.P. simply saying, well, go ahead and do it or we'll take down our poster is is that it undermines its own legitimate policies. Then this court is in the posture of saying, well, your legitimate business interests must defer to a religious expression in the workplace. And I think that turns the standard entirely upon his head. Once you do that, then every employee can simply come in and say, irrespective of the policy, irrespective of the political sensitivities of homosexuality, I disagree with this policy and therefore I am making a religious statement. You must now capitulate to my religious statement because it is religiously protected. Does H.P. have a stated policy against the posting of religious sayings or scripture generally? It has a policy concerning posting, but it does not address religious statements. But it does have a harassment policy which says it will not tolerate a lack of respect or hostility or offense against people based upon their race, their color, their national origin. And it's longstanding policy, sexual orientation. And you're but you're not arguing that their policy against harassment is commanded by Title 7 or are you? Not at all. I think quite to the contrary. And I think one of the one of the interesting thing twist that's put on this by the appellant in this case is that when they talk about harassment, they want they want to apply a Title 7 standard of harassment. This is the company's internal policy. It can determine what is harassment and what is not harassment by its policy and by its interpretation and application of its policy. It regarded biblical statements that says to those who are homosexuals, your blood will be upon you as offensive, as harassing, as in violation of its policies. And it required that the employee then acquiesce to its legitimate requests. His only defense is, but I'm acting upon religious belief. The mere fact that he's acting upon religious belief doesn't require an accommodation unless it doesn't require one where it's not susceptible to accommodation. The only accommodation he legitimately offered was you take down your poster. I'll take down my scriptures. The inventive minds of lawyers coming in later on and saying, well, they could have put him in a different room or they could have done this or they could have done that. They met with him repeatedly and he never offered those things to say, putting them in a different room. And my facetious remark was intended to be facetious. But I don't view that as a particularly constructive suggestion, because one perfectly plausible interpretation of doing that is to say somehow this is disfavored. This is an activity we don't like. Therefore, we segregate it off. I mean, this is I'm not particularly enamored of that. And just a question. I hear a law school. I didn't hear you. I'm sorry. Like a wall that we have at Yale Law School. Well, it's what you must have recently. And I suppose we could cordon off. You can put any message. Well, we'll put. Whom it offends. One over here and one sect over here and one sect over there. I may ask you one question. I understood from your opposing counsel that he that Mr. Peterson's position was he had no problem working with gay and lesbian employees. Your brief says that he not only admitted that the verses were intended to be hurtful, but he made clear he did not feel comfortable using the same restrooms and was at a point where he could not work in the same building as gay and lesbian employees. Is that what the record shows that he said he couldn't work in the same building with gay and lesbian employees in the fourth conversation he had? They brought in the worldwide director of customer service for all of HP to meet with him after he'd gone through an escalating group of managers to try and deal with him. And and that was the expression that he made. Gays are filthy. He is afraid to use the same bathrooms with him. He's become uncomfortable with him. It was at this point that the manager said to you to him, why do you work here? Why? Why don't you leave? And he said, because then I don't have the chance to do what I'm doing, which is, I interpret protesting using the workplace as the vehicle for my protest and my against homosexuality and the expression of my religious views. But I think, you know, in all fairness, it's a minor point. It the issue really was the accommodation of the accommodation and what kind of accommodation could have been made. Well, I don't think he was susceptible to accommodation because really, let's say they accommodated and took down the poster. Then next weekend comes in and he says, I'm putting up scriptures again because I really don't like the fact that you allow the gay and lesbian network group to publicize their events in the company's newspaper. That offends me. Now we'll have to take that out. Then something else. I don't even like the fact that your policy, harassment policy, protects and treats equally sexual orientation with race and other classifications. I'm putting up scripture until you change that policy. There is no end to this if the proposal that he made and seems to be reinforced again by his counsel is carried out, except capitulation. Every time the insubordinate harassing conduct violating the company's policies is couched in some religious belief, conviction or command. If if if he had the right to do that, then I take it someone would have the right to do it, even espousing a less recognized religious principle in the scriptures from the Old Testament. I would think it opens the door to almost any religious expression and then open makes the workplace a forum for a debate over religious views and a posting of. Does contrast is HP acknowledge what is it your position that he meets the standard for a prima facie case under Title seven, but there was no reasonable accommodation or do you challenge the whether he shows a prima facie case? I believe that this court can rule as a matter of law that there the accommodation was not susceptible to accommodation and therefore a matter of law is not entitled to it. I take the position HP is always take position that he has not met the standard of a prima facie case. However, this record disagree with me. But I do want to make the point, because when I look at Tiano, I think the language that says you must prove first a bona fide religious belief, the practice of which conflicts with the company duty, then invites an inquiry as to what is the particular of the practice as it conflicts. If you don't have that inquiry, then what are you to accommodate? It becomes a loose field where you've got to accommodate my need to speak out. Well, can you be more particular? And if the practice of which cannot be connected to the conflict, if, for example, in this case, as was the unrebutted testimony from Richard Peterson, that he was required to speak out against evil, homosexuality was evil, but he wasn't required to do it in every instance, he wasn't required to do it in the workplace, he wasn't required to do it in response to this particular posture. He didn't have a conversation with his deity who said, you must act on this, you must be a living witness, for example, on this particular activity. And there are other courts who've gone down this road, and I think legitimately because it opens a wide door. When the Ninth Circuit in Wilson looked at a woman who, out of conviction, wore an abortion button, but didn't have to wear it on the outside, then it opened a door to an accommodation to cover it over, to put it underneath her clothes, and she could still fill the commandments as she defined them, unless there's an examination of the particularities of the commandment. That's it. But that's the point. Mr. Peterson says it wouldn't fulfill it as he defines it, unless he spoke out in the workplace. And if we go down that road, yes, I could satisfy it by putting it under my coat. That would be fine. But the problem you have is either we have to say his interpretation of the scriptures is not a proper one. And when he says I have to speak out in response to this, he's misunderstanding what his religious obligation is. I may be missing the point, Judge Reinhart, but that's not what I'm saying. I'm not asking this court to judge the sincerity or the tenets of his conviction. I'm asking this court to say, to first ask the question, what is the practice that's at issue here that commands you? Because if you don't ask that, then how do you measure the reasonableness of the accommodation? Can we look behind what he says? No. And what he says is it doesn't have to happen in the workplace. No, no. There ends the inquiry. He says once the employer puts up this pro-gay literature, my obligation under the Bible, under my religion, is to counter it, to speak out. I wouldn't have to do it if the employer didn't. But that's his view of what his religious obligation is. And I know in Tiano, this court did look down this road when in Tiano, the employee wanted to go on a pilgrimage to, I forgot where it was, Yugoslavia or whatever. You don't have to go this year. You don't have to go this year. Was there a temporal mandate? In other words, did the commandment require she go in October? Who makes that decision? When she's if she said, yes, as I interpret whatever my religion is, I do have to go every single year. The employee, the plaintiff can define it. But once they've defined it, then it becomes the parameters within which we determine whether there's a conflict. And how do you eliminate that conflict for purposes of accommodation? And if the inquiry doesn't start or if the employee is not put to the test as part of the prima facie burden of defining the parameters of the practice, then we'll never be able to invoke the standards. What does he say is the practice here that he had to engage in to speak out against evil? And did he say that he could do it? Didn't have to do it at work. He could do it otherwise. Yes. So your your position then is he doesn't make his prima facie case because he can't show a conflict with his practice. That's exactly right. If he had said that my practice, what I am commanded to do is to speak out against this poster. Now we have a different issue. Now the accommodation issue takes on a different meaning. I still think that it's not susceptible of accommodation. However, when he defines it as simply speaking out against evil and doesn't involve a command that it take place in the workplace and admits that he can do and does speak out in other contexts. Now, the accommodation is quite different. I guess we'll have to look at the record. I would find it very surprising if he said, you know, of course, he'd say I have to speak out against evil. It doesn't mean I always have to make speeches in the workplace. But if he did, he say that when evil appears at the workplace being promoted by the employer, then I'm not required to speak out. Or did he just say it's not a general obligation to go around making speeches in the workplace? My memory, Judge Reinhardt, of the of the examination is not crystal clear. But I do know that it is quoted in the record in the original record at pages thirty nine and forty. And my questions of him going back and forth in terms of this concept and what it requires and doesn't have to go take place in the workplace is quoted verbatim there. OK. Thank you. Yes. Thank you. I'd like to first address the issue that the council just concluded with and the court concluded with, and that is Richard Peterson. I think that was taken out of context. The statement that Richard Peterson was asked, do you always have to say something in the workplace? Isn't there some other way that you can express yourself? And they talked about writing letters to the editor or maybe making speeches in your church or something else. Richard Peterson said, yes, but in this particular instance, I felt the conviction of the Holy Spirit. I felt that it was absolutely necessary for me to say this is who I am and to distance myself from this campaign. And interestingly enough, that same issue came up in the Halloween instance. Now, we didn't brief the Halloween instance because it wasn't a part of the case. And in fact, if you look at the record carefully, HP said what you did at the Halloween incident has nothing to do with your termination today. Now, we find out in appellate argument that all of a sudden it shows the true character of Richard Peterson. But if you take a look at the record, pages 111 of the excerpts of record and page, I believe, 167 of the excerpts of record, you'll see that that Richard Peterson said he was deeply offended by what he thought was satanic. That is, tarot cards, Ouija boards, people dressed as witches and devils that were at his workstation. And he at that point did the same thing. He put out a brochure that said this is what Christians believe about the origins of Halloween. He was told that is not appropriate religious expression, expression of your opinion in the workplace. And in that instance, he took the brochures and got rid of them. He felt the same conviction, but he was able at that point, he felt that he had made his point. And what I'm saying is that those kinds of convictions are a measured response. In 21 years, this is not a person who's trying to create trouble in the workplace. This is a deeply sincere person with deep, sincere religious beliefs who feels that he has to do something. In that context, to say that unless you can find a scripture in the Bible that specifically mentions HP and tech support and says you have to speak up at HP, that you don't have a mandate is ludicrous. Does the practice, though, have to be some type of generally followed practice of a religion as opposed to an individual's subjective feeling? Don't doesn't requires a particular thing. Doesn't the court require that it be a sincerely held religious belief and that once they determine it sincerely held that under Fowler, it says that you are to go no further. That's what I'm asking. Is sincerely held enough. I think that that sincerely held should be enough. In this case, I think it's also consistent with mainstream Protestant mainstream fundamental Christian belief. And in fact, if you look at the first scripture, the first scripture that he posted from second Corinthians, he said, for we dare not make of ourselves of the number or compare ourselves with some that commend themselves. Difficult to understand, but the purpose of it was he was saying, I don't want to make myself of the number of those who are saying this is OK. I'm setting myself aside. And Corinthians says we dare not do that. And he was saying that's his conviction. We dare not do that. On the second issue on accommodation, counsel indicates we shouldn't let the subjective view determine accommodation. But but that is precisely the standard. We to tell a seventh day Adventist that it's unreasonable to say that I can't work Sundays because Sunday's a great day to work and you should be willing to take Thursday's off if you need one day a week. No, it's a subjective belief that they can't work on Sunday. And the court says it's a sincerely held objective belief, as your honor points out, generally accepted by that that denomination and one that they follow. And we must accommodate that if we can. In this case, HP made no offer of accommodation. And in the Burns versus Southern Pacific Transportation Company case cited by the in the Applebee's record, it says that the court was skeptical of hypothetical hardships. The employee there was was creating when they'd not really tried to accommodate. And on that issue, a great deal has been made that Richard Peterson wouldn't be accommodated and that in the end. And I think Justice Reinhart pointed out that this comment that was made where Richard Peterson said, well, they're filthy and and I can't can't work with him. That stands in stark contrast to the fact he had worked with them for 21 years, that that the record is clear at pages 178, 175 and 182, where Marilyn Taylor, Sherry McGrath and Nick Fowler, the three supervisors said that nobody ever complained about Rich Peterson's dealings with gays at the workplace. This statement was made at that during four meetings where he was sequestered with supervisors after he'd been removed from his job and was told your job's at stake. And at that point, he makes the comment, you know, what are you going to do about it? And he says, well, I think they're filthy and all this other. I mean, put yourself in the shoes of a person who has worked as a tech support person at HP and all of his supervisors say your career is coming to an end. If you don't alter your religious beliefs and he said, if you don't take the posters, if you insist on keeping the posters up, that's and he the point is, whose duty is it to propose an accommodation? At this point, he says, well, take the posters up, leave them down, whatever. But HP made no effort whatsoever to look into accommodating him in ways that they certainly could have. The only thing they offered him was something prohibited by their policy. Set up a religious network group, something specifically, explicitly. You'll find it in the record at page 136 and 140 expressly prohibited by their policy was the only thing they offered him in that context. Is the employee the one who's supposed to figure out how the employers to accommodate him? Isn't that the burden? He's the only one who really can tell what's going to be consistent with his religious beliefs. I mean, if we're not going to look for his religious beliefs objectively and by saying, well, this is one that people commonly hold. But if we say, you know, this man has a right to his own religious beliefs. He has a right to decide what it is that he feels his religion does. Then it seems to be the way to find out what kind of accommodation will fit with your religious belief is to ask. And they did. And he told them two things that I think either one would have been acceptable. And I think there are others beyond that. There were two things they discussed. And so those we have to decide are those. But those are what Richard Peterson proposed. Richard Peterson proposed, I'll put them up or we both take them down. And as Justice Fletcher indicated, the record is unclear as to I don't believe that Richard Peterson ever went beyond the poster near his cubicle. But I don't think that I can point to the specific. And I think that may be. And I don't know whether it's near. That's true. But the one that he passed, the one that was in the hallway where he worked, because there were different ones in different places. Finally, Your Honor, the I don't think we ever got to the point of of whether or not this could be accommodated, because I don't think HP wanted to go there. And it's indicative by the way that this was handled by Hewlett Packard. And I don't think we go to the parade of horribles that counsel gets to when he says, well, if we prove if we let him put up this innocuous poster that nobody ever complained about or was offended by the next, what are we going to do? You know, or maybe as Justice Fletcher indicates, maybe then we'll have, you know, pornographic movies being shown on the workplace someplace. I don't know. I'm sorry. That was facetious, too. And I shouldn't be facetious with the Court. But but in any event, I don't think we get to that parade of horribles. This is a simple this is a case of innocuous statements. Thank you, Your Honor. Innocuous in one view. OK. All right. Thank you, counsel. Thank you both very much. The case just argued will be submitted. The next case is Pottinger v. Potlatch Corporation. Thanks. Today, he committed an abomination, which was dead with blood bloodshed. My name is Candy Dale and I represent the plaintiff appellant, Charles R. Pottinger in this matter, and I would like to save five minutes, if possible, reserved. Well, Judge Gould is a little better than I do at watching this clock. One of us will try to tell you. Okay. Thank you. It's my privilege today to represent Charles R. Pottinger. He's actually here in the courtroom today with me. And I guess somewhat coincidental, today would have marked 35 years of his start date of working with the Potlatch Corporation. Mr. Pottinger started with that corporation on March 4 of 1968.
judges: Reinhardt, W Fletcher, Gould